UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Natasha Henderson,

      Plaintiff,

v.                                                    Civil Action No. 16-11648

The City of Flint, *et al.,*                          Sean F. Cox
                                                      United States District Court Judge

      Defendants.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Plaintiff Natasha Henderson ("Henderson") filed this action against the City of Flint and

its Mayor, Karen Weaver ("Weaver"), following Henderson's termination. Henderson asserts:

1) a First Amendment retaliation claim, under § 1983; 2) a wrongful termination claim under

Michigan's Whistleblower's Protection Act ("WPA"); and 3) defamation claims under Michigan

law against Weaver. The matter is currently before the Court on Defendants' Motion for

Summary Judgment. The parties have fully[1] briefed the issues and the Court heard oral

argument on July 27, 2017. As explained below, the Court shall GRANT the motion because: 1)

Henderson's First Amendment Retaliation claim fails because her speech at issue is not

protected speech because it was made pursuant to her official duties, rather than as a private

citizen; 2) Henderson cannot proceed to trial on her WPA claim because she cannot establish

that the individual who terminated her employment had knowledge of her protected conduct

_____

      [1]Henderson filed a motion seeking leave to file a sur-reply brief, which this Court
granted.

prior to the termination; and 3) Weaver is entitled to absolute immunity under Michigan law as to Henderson's defamation claims against her.

## BACKGROUND

Plaintiff Henderson filed this action on May 9, 2016. The action is in federal court based upon federal-question jurisdiction over Henderson's First Amendment retaliation claim.

Henderson's Amended Complaint is the operative complaint and it asserts the following counts against Defendants the City of Flint and Weaver:

- "Violation of First Amendment Rights Pursuant to 42 USC § 1983" (Count I), asserted against both Defendants;

- "Wrongful Termination in Violation of the Whistleblowers' Protection Act" (Count II), asserted against both Defendants;

- "Wrongful Discharge in Violation of Public Policy ('Public Policy Tort')" (Count III), presumably asserted against both Defendants;

- "Breach of Contract" (Count IV), asserted against the City; and

- "Defamation" (Count V), asserted against Defendant Weaver.

The docket reflects that in March of 2017, Henderson stipulated to the dismissal of Counts III (Public Policy Tort) and IV (Breach of Contract) of her Amended Complaint. (D.E. No. 27).

Following the close of discovery, Defendants filed the pending Motion for Summary Judgment.

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

In compliance with this Court's guidelines, in support of their Motion for Summary Judgment, Defendants filed a "Statement of Material Facts Not In Dispute" ("Defs.' Stmt.").  In response to that submission, Henderson filed a "Counter-Statement of Disputed Facts" ("Pl.'s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, viewed in the light most favorable to Henderson, the non-moving party.  Because the Court does not reach all of the grounds raised by Defendants, the Court includes here only the facts relevant to the issues addressed.

The City of Flint is an incorporated municipality in the State of Michigan.  (Defs.' Stmt. & Pl.'s Stmt. at ¶ 1).

Flint was under continuous receivership from November 2011 through April 29, 2015, pursuant to Michigan Public Act 436.  (*Id.* at ¶ 2).  Also, during that same time period, an Emergency Manager had the management authority to control the City, which usually rested with elected officials (such as the mayor).  Such authority included the ability to appoint certain members of the executive branch of the City government, who would normally be appointees of

the duly elected Mayor. (*Id.* at ¶ 3).

Anthony Chubb ("Chubb") was employed by the City of Flint from 2013 until June of 2016. (Chubb Dep. at 7). Chubb began his employment with the City as Deputy Chief Legal Officer. (Chubb Dep. at 9).[2]

In December of 2014, Emergency Manager Darnell Early appointed Henderson to serve as Flint's City Administrator, effective February 23, 2015. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 4). Henderson's employment was governed by a written Employment Agreement and Henderson was a party to a Confidentiality Agreement. (*Id.* at ¶ 5). In addition, two Emergency Managers Orders ("EMOs") pertained to her employment.

Under EMO 3 and 20, all city department heads served at Henderson's pleasure, and all discharges had to be approved by her. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 6).

Among other things, Henderson's job duties as City Administrator included "[e]nsur[ing] that the City is in full compliance with Public Act 436, all Emergency Manager Orders, local ordinances, and applicable state and federal laws." (Ex. 6 to Def.'s Br.).

Weaver was elected as Mayor of Flint on November 3, 2015, and was sworn in on November 9, 2015. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 9).

In February of 2016, Chubb became the City's Interim[3] Chief Legal Officer after the person who held the position resigned and recommended him for the interim position. (Chubb Dep. at 12; Pl.'s Br. at 18).

---

[2]From December of 2014 through December of 2015, Chubb also served as the Interim Director of Human Resources and reported to Henderson, the City Administrator, in that capacity. (Chubb Dep. at 9-10; Pl.'s Stmt. at ¶ 23).

On February 9, 2016, while at work at City Hall, Henderson had a conversation with Maxine Murray, Weaver's administrative assistant. Murray reported concerns to Henderson about Weaver. (Pl.'s Stmt. at ¶ 19; Henderson Dep. at 76-77). Murray told Henderson that Weaver had instructed her and a volunteer for the City to direct donations from an approved fund to another fund. (Pl.'s Stmt. at ¶ 20).

On February 9, 2016, Henderson had a verbal conversation with Chubb, in his office at City Hall, about her concerns about Weaver's alleged conduct. Henderson then sent Chubb a written email on February 10, 2016. (Lundquist Dep. at 65-67; Pl.'s Stmt. at ¶¶ 24-25).

Henderson sent that email to Chubb, at his city email address, and from her city email address. (Ex. 13 to Defs.' Br.). The subject line of the email was "Allegation of Unethical Conduct." (*Id*.). The body of the email stated:

> Hello Tony,
>
> Ms. Maxine Murray, the Mayor's Assistant, spoke with me on February 9, 2016 while in the supply room of the Mayor's Executive Office and reported an alleged conduct, if substantiated, is potentially unethical. Specifically, Ms. Murray fearfully stated that Mayor Weaver asked her and a volunteer in the Mayor's office to direct donations to a fund named Karenabout Flint created by Miller Canfield that I am unaware of and asked if she would be guilty of a crime to direct potential donors to this fund when they call the Mayor's Office. I am only aware of a fund approved by Resolution of the Council named Safe Water/Safe Homes to be administered by the Community Foundation of Greater Flint that will be presented on today for approval by the RTAB.
>
> As you are Chief Legal Counsel, please promptly initiate an investigation of this matter in your capacity. In the meantime, please advise appropriate actions I can take to protect employees from potential retaliation resulting from them reporting allegations such as this.
>
> Thanks,
>
> Natasha L. Henderson, City Administrator
> City of Flint, Michigan

1101 S. Saginaw St.
Flint, MI 48502
Email: nhenderson@cityofflint.com
Phone: (810) 237-2057
www.cityofflint.com

(*Id.*) (emphasis added).  Henderson testified as follows regarding the above email to Chubb:

> Q.   Okay.  And if I'm reading this E-mail correctly, and I believe you also
>       testified to this, but correct me if I'm wrong.  You weren't claiming that
>       Mayor Weaver has engaged in any improper conduct at this time; you
>       wanted him to look into it, right?
> A.   Yes.

(Henderson Dep. at 193).

But Henderson believed that it may be illegal to tell people who were trying to donate

money to the water crisis to send money to a secret fund. (Pl.'s Stmt. at ¶ 26; *see also* Pl.'s Dep.

at 80-84).

In response to Henderson's February 10th email, Chubb responded, "I will take prompt

action and advise you later today."  (Pl.'s Ex. H).

On February 12, 2016, Henderson emailed Chubb again, in the same email thread as her

February 10th email, stating:

> Hello Tony,
>
> I am following up for an update on this issue.  This is a very serious matter, and I
> would like to ensure that this is investigated promptly to ensure the integrity of
> the City and its employees.
>
> Thanks,
>
> Natasha L. Henderson, City Administrator
> City of Flint, Michigan
> 1101 S. Saginaw St.
> Flint, MI 48502
> Email: nhenderson@cityofflint.com
> Phone: (810) 237-2057

www.cityofflint.com

(Pl.'s Ex. H).  Approximately a half hour later, Chubb responded to Henderson: "We have

contacted the State Bar Ethics Hotline to determine what role my Department might be able to

play in this investigation."  (Def.'s Ex. 13).

Chubb testified that he did not tell Weaver about Henderson's report to him prior to

Henderson's termination:

> Q.      Had you had discussions with Mayor Weaver about her desire to fire
>         Natasha Henderson prior to February 12th?
> A.      Never.
>              I'm sorry, can we clarify that February 12th was her termination
> date?
> Q.      Yes.
> A.      Never.
> Q.      Okay.  When did you learn that she wanted to fire Natasha Henderson?
> A.      The afternoon of February 12th.
> Q.      Do you remember why she said that she wanted to terminate her?
> . . . .
> A.      To put this in context, we had fired the chief of police and then the chief
>         of fire earlier that day, and I wasn't really given reasons.  When people
>         would come into the room, she would just tell me who we were firing
>         next, essentially.  And after we fired the chief of fire, then she said we had
>         one more in the afternoon.  And I believe it was that afternoon that I
>         learned it was Ms. Henderson, and I don't believe at that time I[4] was given
>         any reason for that.
> BY MS KENNEY:
> Q.      Okay.  What is your testimony today regarding whether or not you told the
>         mayor about Natasha's claims of unethical conduct?
> A.      I did not tell her about Natasha's claims of unethical conduct prior to
>         Natasha's termination.
> Q.      And why not?
> A.      As soon as I received the complaint, I sent it to my assistant city attorneys,
>         my assistant civil attorneys, which were William Kim and David Roth.
>         And Mr. Kim immediately brought up the idea that conflicts of interest

---

[4]Chubb testified that he found Henderson to be "highly competent" and when asked if he
thought she was good at her job as City Administrator he testified "Very much so."  (Chubb Dep.
at 33-34).

were very likely in this situation, which I – we – I think was all understood immediately to be the case.

And so we had a brief meeting about it, and I instructed him to contact the Michigan Bar to make a determination whether ethics violations had – did exist or would exist if we were to attempt to investigate the claim ourselves. And until I had a firm response from the bar, I didn't want to broach the topic with the mayor out of concern that I would be violating conflicts of interest rules.

Q. And at that time you wanted the permanent chief legal officer, correct?

A. Correct.

Q. And you didn't think, in your position as interim chief legal officer, that when you had knowledge of this email from Natasha Henderson, and Mayor Weaver indicated she wanted to fire her, you didn't believe that was something you should make her aware of?

A. No, not at all.

(Chubb Dep. at 36-39).

Other than Chubb, Jody Lundquist was the only other City employee that Henderson told about Murray's comments to her. (Defs.' Stmt. & Pl.'s Stmt. at ¶ 30). Lundquist testified that she did not tell Weaver about Henderson's report to Chubb because she did not think it would be appropriate to do so, given that the issue involved the Mayor. (Lundquist Dep. at 98-99).

On February 12, 2016, Weaver terminated the City's Chief of Police and the Fire Chief. (Defs. & Pl.'s Stmt. at ¶ 35).

Later that same day, February 12, 2016, Weaver terminated Henderson from her position as City Administrator during a meeting in her office at City Hall. In addition to Weaver and Henderson, Chubb and the interim Human Resources Director were present for that meeting. After Weaver handed Henderson a written termination letter, Henderson told Chubb that her attorney would be in contact from that point on. (Henderson Afft. at ¶ 53).

Records show that a meeting notice was created for a February 16, 2016 meeting between Weaver and Chubb and the subject was "Special Session Re: N. Henderson." (Ex M to Pl.'s

Br.).  The notice identifies Murray, Weaver's administrative assistant,  as the "creator" of the notice, whose attendance was optional.  (*Id.*).  Chubb testified that Murray was not a participant in the meeting and that she was on the notice simply because she managed the mayor's calendar.  (Chubb Dep. at 58-59).  During his deposition, Henderson's counsel did not ask Chubb any questions about what was discussed at that meeting, recognizing that the conversation was likely subject to the attorney-client privilege.  (Chubb Dep. at 59-60).  When asked about this notice during her February 15, 2017 deposition, Weaver testified, "I don't recall what the purpose of the meeting is, it doesn't have it on here."  (Weaver Dep. at 155).

On February 19, 2016, Henderson's counsel wrote Chubb a letter, advising that Henderson was going to pursue breach of contract and wrongful termination claims against the City.  (Pl.'s Ex. N).  That letter noted that Henderson had reported concerns over donations being directed to another fund.  The letter asked if Chubb was interested in exploring a resolution.

On February 22, 2016, Chubb responded that he would be open to exploring settlement negotiations.  (Pl.'s Ex. O).

About a month after Henderson and the police and fire chiefs were terminated, Chubb learned that he was not going to get the permanent Chief Legal Officer position and that Weaver was appointing someone else to that position.  (Chubb Dep. at 16).  Chubb testified:

> Q.    When did you find out that you did not get the permanent chief legal position?
>           And if you don't know the exact date, estimating a time frame is fine.
> A.    I'm trying to put it into context. . . I think it was approximately a month after Natasha and the chiefs were terminated.
> Q.    How did you find out?
> A.    My secretary – or my paralegal . . . called me to say that she had been asked to type up her employment contract.
> Q.    Prior to that date had you had discussions with Mayor Weaver about you

|      | becoming chief? |
|------|------|
| A.   | Yes. |
| Q.   | Do you remember how many discussions you had? |
| A.   | We just had one discussion, and it was shortly after the termination of Natasha and the chiefs. And I just said – and we just had a frank discussion in which I asked her to make me chief. I said that I had been – I had shown my support for her and that I thought it was time that that happened. |
| Q.   | What was her response? |
| A.   | She said that she hadn't even thought about it because my department was one of the only ones that was running smoothly. And so she said she would think about it. |
| Q.   | When you finished that conversation did you have positive feelings that you would become chief? |
| A.   | No. |
| Q.   | You didn't have feelings either way? |
| A.   | No, I thought it was disingenuous. |
| Q.   | What do you mean by that? |
| A.   | I knew that she certainly must have thought about who her attorney would be, so I thought it was disingenuous. |

(Chubb Dep. at 16-17). Chubb was upset that he did not get the position. (Chubb Dep. at 17).

Thereafter, Chubb made allegations that he may not have gotten the position in retaliation for having complained about a deputy legal officer having made decisions about the hiring of law firms over water quality lawsuits. (*See* Chubb Dep. at 20-21). That is, Chubb was alleging that he was the victim of retaliation by Weaver. Chubb ultimately resigned pursuant to a negotiated separation agreement, under which he resigned and received a payment of $56,000. (*See* Pl.'s Ex. R). Weaver signed that agreement on behalf of the City on June 7, 2016. (*Id*.).

## ANALYSIS

Henderson has three remaining claims: 1) Count I, a § 1983 count based upon a First Amendment retaliation claim; 2) Count II, her claim under Michigan's WPA; and 3) Count V,

her defamation claim against Weaver under Michigan law.  Defendants' Motion for Summary

Judgment challenges all three claims.

I.      **First Amendment Claim (Count I)**

To make a prima facie case for a First Amendment retaliation claim, an employee must

show that: 1) she was engaged in constitutionally protected conduct; 2) she suffered an adverse

action sufficient to deter a person of ordinary firmness from engaging in such conduct; and 3) the

adverse action was motivated at least in part by the plaintiff's protected conduct.  *Handy-Clay v.*

*City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012).

Here, however, the plaintiff employee was a public employee.  The Sixth Circuit has

explained that:

> "When a citizen enters government service, the citizen by necessity must accept
> certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410,
> 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (citation omitted). However, public
> employees do not forfeit all their First Amendment rights simply because they are
> employed by the state or a municipality. *See id.* at 417 , 126 S.Ct. 1951; *see also*
> *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)
> (noting that it is well established "that a state cannot condition public employment
> on a basis that infringes the employee's constitutionally protected interest in
> freedom of expression" (citations omitted)). The Supreme Court has determined
> that the First Amendment protects a public employee's right, under certain
> circumstances, to speak as a citizen on matters of public concern. *Garcetti*, 547
> U.S. at 417, 126 S.Ct. 1951.  However, when a public employee speaks as an
> employee on matters of personal interest, "a federal court is not the appropriate
> forum in which to review the wisdom of a personnel decision taken by a public
> agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at
> 147, 103 S.Ct. 1684 (citation omitted).
>
> We note that these principles are meant to protect not only the constitutional
> rights of public employees but also "the public's interest in receiving the well-
> informed views of government employees engaging in civic discussion." *Garcetti*,
> 547 U.S. at 419, 126 S.Ct. 1951; *see also San Diego v. Roe,* 543 U.S. 77, 82, 125
> S.Ct. 521, 160 L.Ed.2d 410 (2004)("The interest at stake is as much the public's
> interest in receiving informed opinion as it is the employee's own right to
> disseminate it."). Thus, in reviewing a claim such as Handy–Clay's, a court must

11

seek a balance between promoting "the individual and societal interests that are served when employees speak as citizens on matters of public concern," and respecting "the needs of government employers attempting to perform their important public functions." *Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951 (citation omitted).

*Id.* at 539-40.

In their motion, Defendants challenge this claim by asserting that Henderson: 1) cannot establish that she was engaged in constitutionally protected speech; and 2) in addition, cannot show that her termination was motivated by her alleged speech in any event.

### A.      Did Henderson Engage in Protected Speech?

A three-part test is used to determine whether a public employee's speech is constitutionally protected.  Under that test, the employee must show that: 1) that her speech involved a matter of public concern; 2) that her speech was made as a private citizen, rather than pursuant to her official duties; and 3) that her interest as a citizen in speaking on the matter outweighed the state's interest, as an employer in promoting the efficiency of the public services it performs through its employees.  *Handy-Clay*, 695 F.3d at 540; *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017).

Here, Defendants assert that Henderson did not engage in protected speech where she voiced concerns about Weaver to Chubb pursuant to her official duties as City Administrator, rather than as a private citizen.  (Defs.' Br. at 10-13).

The determination as to whether Henderson engaged in protected speech is an issue of law.  *Mayhew*, 856 F.3d at 464.

The "critical question" is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Id.* (citation omitted).  As

the Sixth Circuit has acknowledged, "[d]etermining whether an employee speaks as a private citizen or as a public employee can be challenging" and that the "Supreme Court has not 'articulate[d] a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate.'" *Id*. "Instead, the 'proper inquiry is a practical one,'" and to assess the statement at issue, the Court must consider both its content and context. *Mayhew*, 856 F.3d at 464. Several non-exhaustive factors are considered, including: "the speech's impetus; its setting; its audience; and its general subject matter." *Id*. Other factors that may be relevant include "whether the speech was made inside or outside of the workplace and whether it concerned the subject-matter of the speaker's employment." *Handy-Clay*, 695 F.3d at 540. Those "who, where, what, when, why, and how" considerations inform the answer to that critical question of whether the speech at issue is itself ordinarily within the scope of an employee's duties. *Mayhew,* 856 F.3d at 464.

In *Handy-Clay*, the plaintiff was employed as a public records coordinator for the City of Memphis. After her termination, she claimed that she was terminated in retaliation for her allegations about corruption and mismanagement in the city. The district court dismissed her First Amendment retaliation claim, concluding that the plaintiff had not sufficiently alleged that she had spoken as a private citizen rather than an employee performing her job duties. On appeal, the Sixth Circuit concluded that some of the plaintiff's speech was protected and some was not. The plaintiff's speech about obstacles interfering with her ability to produce records was not protected because those complaints "were directly related to her alleged job responsibilities and, thus, her speech was made in her capacity as an employee and not as a private citizen." *Handy-Clay,* 695 F.3d at 541-42. But another category of the plaintiff's

speech, her speech about how city funds were being improperly used because various employees in other departments of the city offices were not properly logging their vacation or sick time, was protected.  That was because she had sufficiently alleged that she was speaking as a concerned citizen rather an employee performing her job:

> [O]ur review of the complaint, taking the allegations as true, leaves us with the firm impression that Handy–Clay has alleged sufficient facts to justify an inference that she spoke on these issues, both to her superiors and outside her chain of command, as a concerned citizen addressing an issue of public corruption. We find nothing in the complaint that suggests that the duties of her position as public records coordinator included reporting on government corruption and mismanagement of public funds.

*Id.* at 543.

In *DiBrito v. City of St. Joseph*, 675 F. App'x 593 (6th Cir. 2017),  the plaintiff was employed as the deputy director of the city's public safety department.  Following his termination, the plaintiff brought a First Amendment retaliation claim.  The district court granted summary judgment in favor of the city and the Sixth Circuit affirmed.  In doing so, the Sixth Circuit addressed the issue of whether a complaint[5] that the plaintiff had made about the Director's purchase of a firearm that had been turned in by a city resident was protected speech. The Sixth Circuit concluded that was not protected speech because "DiBrito's complaint about Clapp's firearm purchase was made pursuant to his official duties as Deputy Director of Public Safety rather than a private citizen." *Id.* at 597.  The Sixth Circuit explained:

> As a police officer, DiBrito felt that Clapp had violated the law when he purchased the firearm given to the PSD. After reviewing the state law and contacting federal officials, DiBrito prepared a complaint to Lewis. This complaint was prepared on department letterhead, referenced a police report

---

[5]There was a second complaint at issue in that case also, but it was found not to be protected speech on another basis.

> regarding the turned-in firearm, made recommendations regarding additional investigations that should be undertaken, and was signed "Deputy Director Al DiBrito." These facts prove that DiBrito was acting as Deputy Director of the PSD rather than a "concerned" citizen.

*Id.* at 597-98. Therefore, the Sixth Circuit held that "DiBrito's complaint about Clapp's firearm purchase is not protected because it was made pursuant to his official duties rather than as a private citizen." *Id.*

In *Mayhew v. Town of Smyrna*, 856 F.3d 456 (6th Cir. May 11, 2017), the plaintiff was employed as a lab supervisor for the Town of Smyrna's waste-water treatment plant who brought a First Amendment retaliation claim following his termination. The plaintiff's alleged protected speech consisted of: 1) his reporting of questionable conduct by another supervisor, relating to the collection, recording, and reporting of water samples, to the plant manager; and 2) a complaint to human resources that two employees were hired into positions they were not qualified for and without the town's hiring protocol having been followed. The district court granted summary judgment in favor of the town and the defendant manager. The Sixth Circuit affirmed in part and reversed in part.

As to the plaintiff's complaint about alleged misconduct relating to water samples, the court held that was not protected speech. The court rejected the plaintiff's assertion that his complaint was borne out of civil and moral responsibility, rather than his job functions. The court held that "given plaintiff's explicit job responsibilities to oversee the plaint's water-sampling regime and report any issues regarding that regime, the district court correctly granted summary judgment in favor of defendants as to Mayhew's First Amendment claim to the extent that it was grounded in his reports of Noble's misconduct." *Id.* at 466. As to the other complaint, the one made to human resources about hiring protocols not being followed, the

plaintiff was permitted to pursue a First Amendment retaliation claim based on that speech.

Here, the impetus for Henderson's speech to Chubb was Henderson (the City Administrator) having been approached by a City employee, at the workplace, who reported concerns to her about the Mayor redirecting donations to a secret fund.

Henderson believed that it was illegal to tell people who were trying to donate money to the water crisis to send money to a secret fund. (Pl.'s Stmt. at ¶ 26; *see also* Pl.'s Dep. at 80-84). Henderson's job duties as City Administrator expressly included "[e]nsur[ing] that the City is in full compliance with Public Act 436, all Emergency Manager Orders, local ordinances, and applicable state and federal laws." (Ex. 6 to Def.'s Br.).

Henderson then went to Chubb, the City's interim Chief Legal Officer, and had a verbal conversation about that employee's report. That conversation occurred at the workplace, at City Hall. Henderson then sent Chubb a written email to reiterate what she verbally told him. That email was sent to Chubb at his official work email address and was sent by Henderson from her official work email address. The body of it stated:

Hello Tony,

Ms. Maxine Murray, the Mayor's Assistant, spoke with me on February 9, 2016 while in the supply room of the Mayor's Executive Office and reported an alleged conduct, if substantiated, is potentially unethical. Specifically, Ms. Murray fearfully stated that Mayor Weaver asked her and a volunteer in the Mayor's office to direct donations to a fund named Karenabout Flint created by Miller Canfield that I am unaware of and asked if she would be guilty of a crime to direct potential donors to this fund when they call the Mayor's Office. I am only aware of a fund approved by Resolution of the Council named Safe Water/Safe Homes to be administered by the Community Foundation of Greater Flint that will be presented on today for approval by the RTAB.

As you are Chief Legal Counsel, please promptly initiate an investigation of this matter in your capacity. In the meantime, please advise appropriate actions I can take to protect employees from potential retaliation resulting from them reporting

allegations such as this.

Thanks,

Natasha L. Henderson, City Administrator
City of Flint, Michigan
1101 S. Saginaw St.
Flint, MI 48502
Email**:** nhenderson@cityofflint.com
Phone: (810) 237-2057
www.cityofflint.com

(*Id.*).

Considering all of the relevant factors, Henderson's speech to Chubb is not protected speech because it was made pursuant to her official duties rather than as a private citizen. All of the speech, and even it impetus, occurred at the workplace. Henderson's express job duties included "[e]nsur[ing] that the City is in full compliance with Public Act 436, all Emergency Manager Orders, local ordinances, and applicable state and federal laws." (Ex. 6 to Def.'s Br.). And like the plaintiff in *DiBrito,* Henderson's communication was made in writing, was signed by her with her official title listed, and actually gave direction to Chubb regarding the investigation that should be undertaken by him. And two days later, Henderson emailed Chubb again, in the same email thread, asking Chubb for an update on the issue and again including her City Administrator title in her email. All of this shows that Henderson was acting as City Administrator rather than a concerned citizen.

The Court shall therefore grant summary judgment in favor of Defendants as to Henderson's First Amendment Retaliation claim on the ground that her speech is not protected. Given that ruling, the Court need not consider Defendants' additional challenges to this claim.

## II.   WPA Claim (Count II)

WPA claims are analyzed in a similar fashion to First Amendment Retaliation claims and retaliatory discharge claims under the Elliott Larsen Civil Rights Act. Thus, the familiar burden-shifting framework applies.

There are, however, there are some important differences. Significantly, a public employee who reports violations or suspected violations of a law or regulation as part of his or her official duties can still be protected under the WPA. *See Vandyke v. Leelanu County*, 2010 WL 624382 at * 4 (6th Cir. 2010) and *Brown v. Mayor of Detroit*, 478 Mich. 589 (2007). Thus, the basis for granting summary judgment as to Henderson's First Amendment retaliation claim (that her speech is not protected because it was made pursuant to her official duties rather than as a private citizen) does not apply to Henderson's WPA claim.

Section 2 of Michigan's WPA provides, in pertinent part, that an employer "shall not discharge, threaten, or otherwise discriminate against employee" because "the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a *suspected violation* of a law or regulation or rule promulgated pursuant to law of this state, or the United States to a public body." Mich. Comp. Laws § 15.362. (emphasis added).

**A.      Can Henderson Establish A Prima Facie Case Under The WPA?**

To establish a prima facie case under the WPA, Henderson must show that: 1) she engaged in protected activity as defined by the WPA; 2) she was discharged; and 3) a causal connection existed between the protected activity and the discharge. *Kuhn v. Washtenaw Cty*., 709 F.3d 612, 629 (6th Cir. 2013) (citations omitted).

Here, Defendants challenge Henderson's ability to establish the first and third elements

of a prima facie case.

### 1.    Protected Activity

The WPA contemplates three types of protected activity: 1) reporting to a public body a violation or suspected violation of law, regulation, or rule; 2) being about to report such a violation to a public body; or 3) being asked by a public body to participate in an investigation. *Id.*

Here, Henderson alleges that she "reported suspected violations of State and Federal laws, regulations, and/or rules governing the use of public donations."  (Am. Compl. at ¶ 60). Now, at the summary judgment phase, Henderson asserts that her email to Chubb constitutes protected activity under the WPA.  (*See* Pl.'s Br. at 6).

Defendants argue otherwise.  In their motion, Defendants assert that "Henderson admitted at her deposition that she made no report" (Defs.' Br. at 15) and direct the Court to the portion of her deposition testimony, wherein she testified as follows:

> Q.    Okay.  And if I'm reading this E-mail correctly, and I believe you also
>        testified to this, but correct me if I'm wrong.  You weren't claiming that
>        Mayor Weaver had engaged in any improper conduct at this time; you
>        wanted him to look into it, right?
> A.    Yes.

(Henderson Dep. at 193).  Defendants assert that Henderson has not identified any law that she suspects was violated.  Defendants assert that Michigan's WPA does not allow a whistleblower "to report a suspected violation of a suspected law, rule or regulation."  (Defs.' Br. at 16). Defendants' Brief directs the Court to "*Debano-Griffin v. Lake Cty. v. Lake Cty. Bd. of Comm'rs*, 486 Mich 938 (2010) (distinguishing a suspected violation of suspected law from a suspected violation of actual law)."  (*Id*. at 15).  In that one-paragraph order, however, the Michigan

Supreme Court *did not address* that issue, stating: "Because the plaintiff reported a suspected violation of an *actual* law, it is unnecessary to address whether the reporting of a suspected violation of a *suspected* law constitutes protected activity.") (emphasis in original).

Construing the evidence in the light most favorable to Henderson, Henderson believed that it may be illegal to tell people who were trying to donate money to the water crisis to send money to a secret fund. (Pl.'s Stmt. at ¶ 26; *see also* Pl.'s Dep. at 80-84). And she reported that conduct to the City's acting Chief Legal Officer – both verbally and in writing. Henderson's brief states that the reported conduct may violate several laws including common law misconduct in office, via Mich. Comp. Laws § 750.505. (Pl.'s Br. at 23). Henderson also stresses that she is protected so long as she reported a suspected violation of a law.[6] Mich. Comp. Laws § 15.362.

The Court concludes that Defendants have not established that they are entitled to summary judgment on this ground. Construing the evidence in the light most favorable to Henderson, there is an issue of fact as to whether Henderson's verbal and written reports to Chubb constitute protected activity under the WPA.

### 2. Causal Connection

For there to be a causal connection between an adverse employment decision and a protected activity in a WPA case," the relevant decision-maker must have actual knowledge of the protected activity before making the decision." *Burns v. Mahle Engine Components USA, Inc.*, 605 F. App'x 522, 527 (6th Cir. 2015) (citing *Kaufman & Payton, P.C. v. Nikkila,* 200

---

[6]Henderson notes, however, that it "is currently still an open question under Michigan law" if a whistleblower is protected if she reports a suspected violation of rule that turns out not to be an actual violation of a statute. (Pl.'s Br. at 22).

Mich. App. 250 (1993)).

Here, it is undisputed that Weaver was the sole decision-maker who decided to terminate Henderson as City Administrator. Henderson was terminated by Weaver on February 12, 2016.

Defendants contend that Henderson cannot show a causal connection because Weaver was unaware of Henderson's alleged protected activity (her conversation and February 10th email to Chubb) at the time she terminated Henderson. Defendants direct the Court to: 1) the deposition testimony of Weaver, who testified that the first time she learned of Henderson's email to Chubb was one to two weeks after she had terminated her (Weaver Dep. at 79); and 2) Chubb's deposition testimony that he did not tell Weaver about Henderson's claims of unethical conduct until after Henderson was terminated. (Chubb Dep. at 37-39).

A "decisionmaker's disavowal of knowledge may be rebutted with countervailing evidence." *Vander Boegh v. EnergySolutions, Inc.*, 536 F. App'x. 522, 530 (6th Cir. 2013). In most cases, "the plaintiff will be able to produce direct evidence that the decision making officials knew of the plaintiff's protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). "But direct evidence of such knowledge is not required" and a plaintiff may survive summary judgment by producing sufficient circumstantial evidence to establish this element of her claim. *Id.* The plaintiff, however, must do more than offer conspiratorial theories, speculations, or hunches. *Id.* (the plaintiff must provide more than "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [personal] experience.").

In response to this challenge, Henderson has not produced any direct evidence that shows that Weaver knew about her alleged protected activity prior to her termination.

Rather, Henderson seeks to prove Weaver's knowledge by circumstantial evidence. She

claims that "there is a fact question as to whether Weaver knew about Henderson's protected activity at the time she fired her." (Pl.'s Br. at 17). Thus, the question is whether Henderson has produced sufficient circumstantial evidence from which a reasonable jury could infer that Weaver knew of Henderson's complaint to Chubb before she fired Henderson.

Henderson directs the Court to the following as circumstantial evidence that shows that Chubb told Weaver about her complaint prior to her termination:

1) Chubb, who at the time of Henderson's termination was interim Chief Legal Officer, wanted Weaver to make his position permanent. Henderson speculates that Chubb giving Weaver a "preview of information about her accused malfeasance could curry favor." (Pl.'s Br. at 18).

2) Chubb discussed the position with Weaver shortly after Weaver terminated Henderson, the police chief, and the fire chief.

3) There is a February 16, 2016 calendar entry for a meeting between Weaver and Chubb and Henderson believes that could have been a "get-our-story-straight" talk. (Pl.'s Br. at 18). And Weaver testified in her February 15, 2017 deposition that she does not recall what that meeting was about.

4) Chubb testified that he did not tell Weaver about Henderson's complaint until February 24th or 25th. Henderson asserts that is not credible because: 1) Chubb knew by February 13th that Henderson had hired a lawyer; and 2) by February 22nd Chubb had agreed to mediation with Henderson on behalf of the City.

5) Chubb's interview with Basiga (wherein Chubb stated he did not tell Weaver about Henderson's complaint before Henderson's termination) occurred during Chubb's negotiation of a settlement with the City, that was approved by Weaver.

The Court concludes that Henderson has not produced sufficient circumstantial evidence from which a reasonable jury could infer that Weaver knew of Henderson's complaint to Chubb before she fired Henderson.

The first two items (that Chubb wanted to be the permanent Chief Legal Officer and discussed that position with Weaver) and the fifth (that Chubb had a motive to lie because he

was negotiating a settlement with the City) are speculation. A plaintiff has to offer more than conspiratorial theories or speculation in order to rebut a decisionmaker's disavowal of knowledge. And here, Chubb has been consistent in his testimony that he did not tell Weaver of Henderson's complaint before her termination and he has offered a very credible reason why he did not do so. Moreover, given that Chubb did not get the position he wanted, was upset about it, and left employment with the City and had been pursuing his own claims against Weaver, his alleged motive to lie (ie., to garner favor with Weaver and get the position) is gone. Yet Chubb still maintains that he did not tell Weaver about the complaint before Henderson's termination. In sum, this strikes the Court as the "sort of conspiracy theory that rarely supports an inference of knowledge of protected activity." *Evans v. Professional Transp., Inc.*, 614 F. App'x 297, 302 (6th Cir. 2015).

The third and fourth items do not aid Henderson because, like the situation in *Vander Boegh*, even if the complaint had been discussed on those dates, it was too late because the termination had already occurred. Henderson was terminated by Weaver on February 12, 2016. Thus, even if Weaver's speculations were true, and Weaver learned about Henderson's complaint on either February 16th or February 22nd, that would not aid Henderson. As in *Vander Boegh*, "none of this evidence shows that [Weaver] had knowledge of [Henderson's] protected activity before" Henderson's February 12, 2016 termination. *Vander Boegh*, 536 F. App'x at 531-32.

Accordingly, the Court concludes that Henderson's evidence is too speculative to create a permissible inference that Weaver had knowledge of Henderson's claim before her February 12th termination. As such, Defendants are entitled to summary judgment on Henderson's WPA

claim.

### III. Defamation Claim (Count III)

The parties agree that the essential elements of a defamation claim under Michigan law are: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication to a third party; 3) fault amounting to at least negligence on the part of the publisher; and 4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.  (Pl.'s Br. at 24; Defs.' Br. at 18); *see also Bhan v. Battle Creek Health Systems*, 579 F. A'ppx 438, 445-46 (6th Cir. 2014).

It is well-established that those essential elements must be "stated *in the complaint*," including the allegations as to the "exact language" that the plaintiff contends is defamatory.  *Id.* (emphasis in original) (citations omitted). "Inherent in those requirements is that the allegations must set forth the where, when, and to whom the alleged statements were published."  *Id.*

Here, Henderson's Amended Complaint contains some allegations concerning defamation that are not sufficiently alleged and, therefore, Henderson cannot pursue a claim based upon those alleged statements.  Those are:

> 37.  Subsequently, on March 14, 2016, in a closed session, the Flint City Council voted to suspend its usual procedural rules, which prevent reconsideration of a resolution within 30 days of a prior vote.  Upon information and belief, Mayor Weaver disparaged and defamed Plaintiff Henderson during this closed meeting, alleging misconduct and other wrongdoing that never occurred and was patently false . . .
>
> . . . .
>
> 40.  Since the March 14, 2016 meeting, Defendant Weaver has continued to disparage and         defame Plaintiff Henderson to City and State employees and the general public through the media.

(Am. Compl. at ¶¶ 37 & 40).  Neither of those allegations are sufficient because Henderson makes only vague, general allegations and does not allege the exact language that Henderson

claims is defamatory.[7]

The Amended Complaint, however, also includes other alleged defamatory statements that are sufficiently alleged:

> 42. In March of this year, Defendant Weaver stated the following to the media, "The former City Administrator, Natasha Henderson, expressed to me that it was not in the best interest of the city to declare a state of emergency," Weaver said. "She said it would upset the governor." These statements are false. Defendant Weaver knew these statements were false or had a reckless disregard for the truth of the statements.

> 43. On May 11, 2016, on the Frank Beckmann radio show on WJR, Mayor Weaver stated and or implied that the reason for Ms. Henderson's termination from the City of Flint was that "she knew about Legionella and didn't say anything about it." This statement is false. Defendant Weaver knew the falsity of the statement when she made it or had reckless disregard for the truth of the statement.

(Am. Compl. at ¶¶ 42-43).

In the pending motion, Defendant Weaver asserts that Henderson's defamation claims against her fail for two reasons: 1) because she is entitled to absolute immunity from tort liability under Michigan law; and 2) the alleged defamatory statements are true in any event.

### A. Is Defendant Weaver Entitled To Absolute Immunity?

Defendant Weaver first contends that she is entitled to absolute immunity under Michigan's Governmental Tort Liability Act.

"Michigan law creates absolute immunity in this setting: 'A judge, a legislator, *and the elective or highest appointive executive official of all levels of government* are immune from tort

---

[7]Moreover, as explained in the next section, Weaver would clearly be immune with respect to any statements made about Henderson to the Council during the alleged closed session, which allegedly pertained to why Henderson should be terminated.

liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.' Mich. Comp. Laws § 691.1407(5)." *Krawczyk v. Twp. of Hagar*, 673 F. App'x 508, 511 (6th Cir. 2016) (emphasis added).

The "first step in applying the immunity statute is to '[d]etermine whether the individual is a judge, a legislator, or the highest-ranking [elective or] appointed executive official.' *Odom*, 760, 760 N.W.2d at 228. If so, a court looks to whether the challenged act was 'within the scope of [that official's] authority.'" *Id.*

Here, there is no dispute as to the first step, as Weaver was Mayor of the City of Flint at all relevant times. Rather, the dispute is whether she was acting within the scope of her executive authority when she made the statements.

The parties agree that a variety of factors are considered when determining whether an official was acting within the scope of his or her executive authority, including: the nature of the specific acts alleged; the position held by the official alleged to have performed the acts; the charter, ordinances, and other local law defining the official's authority; and the structure and allocation of powers in the particular level of government.

Here, the nature of the acts alleged is Weaver making statements to the media about why she ended Henderson's employment as the City Administrator. Weaver's position was the Mayor of the City of Flint. It is undisputed that Weaver's express powers included the power to terminate city department heads. (*See* Defs.' Stmt. & Pl.'s Stmt. at ¶ 18). Thus, Weaver had the express power to terminate Henderson's employment. The question is whether Weaver making comments to the press about why she terminated Henderson's employment is conduct that was within the scope of her executive authority.

In seeking summary judgment on this issue, Weaver directs the Court to *American Transmissions, Inc*., and contends that this case is analogous. *American Transmissions, Inc*., 454 Mich. 135 (1997). In that case, transmission shops sued the Michigan Attorney General for defamation, after he commented to a newspaper about an investigation he had conducted. The comments included that the shops were "crooked." The trial court granted summary disposition in favor of the Attorney General, but the appellate court reversed. The Michigan Supreme Court then reversed the appellate court, concluding that Attorney General was entitled to absolute immunity because his actions were taken within the scope of his executive authority.

Henderson asserts that this case is more analogous to *Marrocco v. Randlett*, 431 Mich. 700 (1988). In that case, the Supreme Court concluded that issues of fact existed as to whether the mayor acted within his executive authority when he took certain alleged actions. Those alleged actions included interfering with a city attorney's resumption of employment to a position that was not subject to the mayor's appointive power and improperly raising the tax assessment on that city attorney's home so that he was forced to sell it.

The facts here are far more analogous to *American Transmissions*. There are no alleged actions that were wholly outside of the Mayor's powers, as was alleged in *Marrocco.*

Moreover, two cases not discussed by the parties are even more persuasive and show that Weaver is entitled to immunity: 1) *Gracey*; and 2) *Hicks*.

In *Gracey*, the plaintiffs filed suit against the Wayne County Clerk, who had called a press conference at which he alleged improprieties on the part of the plaintiffs as to some ballots in an election. The plaintiffs alleged that the Clerk "knowingly gave false information at the press conference concerning plaintiff Irene Gracey's involvement in the election process." *Id.* at

415.  The plaintiffs argued that the "actions of county clerk that might normally be considered within the scope of authority of the clerk become outside that scope when performed for an ulterior purpose," and the Michigan Court of Appeals agreed, stating:

> [E]ven if the county clerk expressly or impliedly possessed authority to conduct a press conference, *Marrocco* suggest that if the county clerk's purpose in holding the press conference was not authorized by law, then the county clerk was not acting within the scope of his executive authority, and he is not entitled to absolute immunity.

*Id.* 417.  That is very similar to the same fact pattern we have here.

Notably, however, "*Gracey* was explicitly abrogated by [the] Michigan Supreme Court in *American Transmissions, Inc*."  *Hicks v. Washington*, 2013 WL 440100 at * 3 (Mich. App. 2013).  *American Transmissions* explicitly rejected any consideration of an actor's subjective motives and stated that *Gracey* was "incorrectly decided."  *American Transmissions, supra.*

Although *Hicks* is an unpublished case, it is very analogous to the facts presented here. In *Hicks*, the president of a school board (Washington) was sued for defamation.  The plaintiff was the former Director of Special Education.  The plaintiff alleged that Washington: 1) prepared a memo detailing the reasons why she believed the plaintiff should be terminated; 2) released that memo to the local news media; 3) responded to inquiries from other school districts by stating that there were charges pending against the plaintiff; and 4) had some involvement with a private website, not connected with the school district, that posted some things about the plaintiff.  There was no dispute that the immunity statute applied to the president of the school board.  The only dispute was whether "Washington was acting within the scope of her executive authority when she allegedly defamed plaintiff."  *Id*. at * 3.  The Michigan Court of Appeals ruled that, with respect to her statements to the board and to the media about plaintiff, they were

clearly within the scope of her authority:

> Plaintiff disputes only whether Washington was acting within the scope of her executive authority when she allegedly defamed plaintiff. Plaintiff argues that deliberate misconduct does not fall within the scope of an official's authority. As discussed above, *Gracey,* supports plaintiff's position but was overruled by *American Transmissions.* In *American Transmissions,* the Supreme Court held that the attorney general was acting within the scope of his executive authority when he responded to questions about an investigation, regardless of his intentions. 454 Mich. At 144, 560 N.W.2d 50. Similarly, *it must be within a school board member's authority to speak to the public about issues affecting the school she is tasked with overseeing. Because there is no malevolent-heart exception to immunity, it does not matter whether Washington deliberately lied about plaintiff, only the context in which she did so.*

> *To the extent that Washington was involved in official WRCS actions, such as responding to the inquiries from Detroit Public Schools, she is immune.* However, some of plaintiff's claims involve Washington's involvement with the Willow Run Watchdog website. This website was not affiliated with or in any way sanctioned by WRCS. It does not appear that Washington used her name or title on the website, or in any way indicated that she was an officer for the district. Indeed, Washington went so far as to deny in her deposition that she knew who the website's administrator was, though plaintiff has since produced documents showing that Washington herself administered the website.

> In this context, it does not appear that Washington's activities on the website can be considered to be within the scope of her authority as school board president, at least not based on the evidence to date. *Her position as president must authorize her to speak officially with [the] public about school issues,* but her alleged secret involvement with a private website, not sponsored or endorsed by the school district, could hardly have been less official. . .

*Id*. at *3-4 (emphasis added).

Accordingly, the Michigan Court of Appeals ruled that Washington was immune from tort liability for all of her alleged statements about the plaintiff, except for some statements made in her private capacity on the private website.

Here too, Weaver is entitled to immunity because her alleged statements were made in the scope of her executive authority.  Under *Hicks*, it is clearly within a mayor's "authority to

speak to the public about issues affecting" the city that she is tasked with running and that includes the reasons why she terminated the employment of the City Administrator. *Hicks, supra; see also*

*Barr v. Matteo*, 360 U.S. 564 (1959) (press release by acting director of government agency, announcing intention to suspend employees for specific conduct, was within scope of director's official duties.).

The Court concludes that Weaver is immune from liability as to Henderson's defamation claims. Given that ruling, the Court need not address Weaver's additional ground for relief (ie., that the statements made were true).

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: August 9, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 9, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager