UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Natasha Henderson,

     Plaintiff,

v.                               Civil Action No. 16-11648

City of Flint,                     Sean F. Cox
                                   United States District Court Judge

     Defendant.
_____/

## OPINION & ORDER
## ON MOTIONS IN LIMINE

     Following her termination as City Administrator, Plaintiff Natasha Henderson ("Henderson") filed this action against the City of Flint and its Mayor, asserting multiple claims. Henderson's only remaining claim is her claim against the City of Flint that she was wrongfully terminated in violation of Michigan's Whistleblower's Protection Act. That sole claim is scheduled to proceed to a jury trial, beginning on May 1, 2019. This Court heard oral argument on motions in limine on April 29, 2019. This Opinion and Order addresses the evidentiary issues presented in the three motions in limine filed by the parties.

### BACKGROUND

     Following her termination as City Administrator, Henderson filed this action against the City of Flint and Mayor Karen Weaver ("Weaver"), asserting multiple claims. During the course of the case, Henderson agreed to the dismissal of her breach of contract claim and her public policy tort claim.

     Following the close of discovery, Defendants filed a summary judgment motion

1

challenging Henderson's three remaining claims: 1) a First Amendment retaliation claim brought

under § 1983 (Count I of Henderson's Amended Complaint); 2) wrongful termination in

violation of Michigan's Whistleblowers' Protection Act ("WPA") (Count II); and 3) a

defamation claim against Weaver under Michigan law (Count V).

In an Opinion & Order issued on August 9, 2017, this Court granted summary judgment

in favor of Defendants as to all three remaining claims.  Henderson appealed.

In an unpublished decision, the United States Court of Appeals for the Sixth Circuit

reversed as to this Court's grant of summary judgment on the WPA claim only.  *Henderson v.*

*City of Flint*, 751 F. App'x 618 (6th Cir. 2018).  As explained in that opinion:

> The crux of this case is Henderson's allegation that she was fired because she
> urged Flint's Interim Chief Legal Officer Anthony Chubb to investigate
> potentially unethical conduct by Mayor Weaver.  According to Henderson,
> Weaver directed that private donations be funneled to an organization she formed
> under 26 U.S.C. § 527 (527 Organization) rather than a City-approved nonprofit
> fund administered by the Community Foundation of Greater Flint.  Henderson
> alleges that Chubb informed Weaver of Henderson's request for an investigation
> and that this caused her to be fired.

*Id.* at 620.

The majority concluded that an issue of fact existed for trial as to Henderson's WPA

claim and remanded as to that claim alone.

The majority concluded that, taken in a light most favorable to Henderson, "the temporal

proximity of her report and termination, the possible pretextual nature of the stated reasons for

her termination, and the questions regarding Chubb's motivations to tell Weaver of the report

create triable issues of fact appropriate for resolution by a jury."  *Henderson*, 751 F. App'x at

628.  The majority found that facts concerning Chubb's own settlement with the City could

constitute circumstantial evidence that would "permit an inference that Chubb's testimony was

swayed by his bias or motive."  *Id.*  In that regard, the majority stated:

> As to Weaver's knowledge of Henderson's report, Henderson argues that there exist disputes of material fact about when Chubb informed Weaver.  The only evidence supporting Chubb's and Weaver's timeline is their own testimony – testimony that, according to Henderson, is unreliable.  *Henderson argues Chubb had the motivation to lie about whether he informed the Mayor at first because he hoped for a permanent appointment as Chief Legal Officer and later because he wanted leverage in settlement negotiations.*  Chubb testified that he asked the Mayor to appoint him to the permanent post, explaining that he "had shown [his] support for her and that [he] thought it was time that happened."  (RR. 33-5, Page ID 725). Chubb initially laid out his timeline during an interview that occurred after Chubb learned that he had not been selected for the position, *but less than a week before he settled his own employment suit against Flint for $56,000.*  When Chubb was deposed approximately six months later, he could not remember the date on which he had spoken to the Mayor about the report, but he was sure the conversation had occurred after Henderson's termination.  (RR. 33-5, PageID 730).
>
> Although Henderson has offered no evidence conclusively establishing that Chubb lied, this is not the type of circumstance in which we would expect such evidence to be readily available.  *The proffered evidence does permit an inference that Chubb's testimony was swayed by his bias or motive . . .*

*Id.* at 627 (emphasis added).

After remand, Henderson agreed to a stipulation and order dismissing Weaver from this action, with the "understanding of the parties that Karen Weaver was at all times relevant an agent of the Defendant City of Flint pursuant to MCL 15.361, and, to the extent allowed by law, such agent's actions, conduct, and statements are attributable to and binding on the Defendant City of Flint."  (ECF No. 57).

Accordingly, Henderson's only remaining claim is her claim against the City of Flint that she was wrongfully terminated in violation of Michigan's WPA.

**ANALYSIS**

The parties have filed three motions in limine, which were all heard by the Court on April 29, 2019.

**A.      Defendant City Of Flint's Motion In Limine**

The City of Flint filed one Motion in Limine that raises multiple issues, which are addressed below.

**1.      Evidence Of Settlement Negotiations Of Henderson's Claims**

The City's motion first asks the Court to preclude Henderson from introducing evidence relating to settlement negotiations between her former attorney and Defendant's former Interim City Attorney, Anthony Chubb. The City's motion attaches, as Exhibit 4, a letter from Henderson's former attorney to Chubb, essentially saying lets discuss and explore a possible resolution of the claims. It is marked as "Confidential Settlement Communication." The City's motion also attaches, as Exhibit 5, emails between the attorneys for the parties that discusses dates and times for those discussions to take place. Henderson's attorney's email states he would like to talk on February 22, 2016. Chubb's email includes, "Let's have an ongoing understanding that all communications between us related to this matter are subject to MRE/FRE 408." (*Id*.).

The City's motion asserts that this evidence should be precluded for three reasons: 1) is precluded by Fed. R. Evid. 408; 2) it is not relevant; and 3) its probative value is outweighed by the danger of unfair prejudice under Fed. R. Evid. 403.

In response, Henderson contends that: 1) the evidence is not barred by Fed. R. Evid. 408, because the evidence is not being presented to prove the validity of Henderson's claims; 2) the evidence is relevant as to the issue of when Chubb first told Weaver of Henderson's report;

and 3) its probative value outweighs any potential unfair prejudice.

Henderson also states that while she believes the probative value of the communications outweighs any possible unfair prejudice and the documents should be presented as they appear, she is willing to redact any specific information in her proposed exhibits that "Defendant believes specifically refers to offers of settlement." (Pl.'s Br. at 3).

At the April 29, 2019 hearing, Counsel for the parties expressed that they may be able to agree upon a stipulation that would resolve this issue. If the parties are unable to so, they should advise the Court and the Court will make a ruling on this issue.

### 2.    Chubb's Own Release And Settlement Agreement

The City's motion states that Henderson has indicated that she "intends to introduce, and will likely refer to or elicit testimony with respect to the terms, as well as the surrounding facts and circumstances, which may have led to a Confidential General Release and Separation Agreement entered into between Defendant and former interim City Attorney, Anthony Chubb on or about June 7, 2016." (Def.'s Br. at 7). That agreement is attached as Exhibit 6 to Defendant's motion, with the amount redacted. The City contends that "Chubb's settlement and release agreement, as well as any related facts, lack relevance, are bereft of any probative value" with respect to the jury's determination of Henderson's claim. (*Id*. at 8).

In response, Henderson asserts that Chubb's settlement and release agreement is relevant to the issues to be decided at trial and explains:

> A primary fact question for the jury is whether Mayor Weaver knew that Plaintiff had reported alleged financial misconduct to Chubb. Both in his interview with Basiga (Pl.'s Ex. Q, ¶ 80) and in his deposition testimony, Chubb claimed that he had not discussed Plaintiff's report of misconduct with the Mayor until after Plaintiff's termination. Chubb's credibility on this claim is an important point, and any evidence that offers a motive to lie or bias should be presented to

the jury so that the jury may appropriately weigh Chubb's credibility. Plaintiff's Exhibit P is directly relevant to proving that Mayor Weaver did know that Plaintiff had reported alleged financial misconduct prior to firing Plaintiff, because it makes it more likely to be true that Chubb had a strong motive to lie when he claimed she did not know.

Chubb answered questions regarding when he told Mayor Weaver about Plaintiff's emails reporting misconduct and asking that it be investigated for the first time when he was interviewed by Basiga on May 31, 2016. (Pl.'s Ex. Q.) Plaintiff's Exhibit P demonstrates that Chubb's $56,000 settlement with the City of Flint was signed merely one week after that interview, on June 7, 2016. A jury could rightly conclude that Chubb must have been in the middle of negotiating his settlement with the City at the time he was interviewed by Basiga. Because Chubb's interview was approximately two weeks later than all other interviews conducted by Basiga, the jury could also infer that Chubb delayed his interview with Basiga until he neared the end of his settlement discussions and had at least a general agreement as to the amount.

In addition to the timing of the settlement making it more likely that Chubb's testimony was not credible, the amount of the settlement payment is also relevant to demonstrate Chubb's motive to lie because the settlement amount is far larger than previous severance agreements that were in place for other Flint executive and appointed employees. Previous agreements for other employees were established and approved by Pete Bade, Jody Lundquist, and Plaintiff. The jury could rightly conclude that Chubb had an original severance agreement in place that had also been approved by Bade, Lundquist, and Plaintiff that was comparable to the amounts received by other City employees, but that he negotiated a higher amount because of his upcoming interview with Basiga regarding Plaintiff's claims against Mayor Weaver. Chubb would have lost the leverage to negotiate a higher settlement amount had he admitted to Basiga that he told Mayor Weaver about Plaintiff's reporting of misconduct.

Chubb's settlement agreement is also relevant because it makes it more likely to be true that Mayor Weaver was aware of the approved employee severance agreements. The fact that the Mayor signed Chubb's agreement herself, rather than CFO Lundquist – who testified that she did not know about Chubb's agreement until after it was signed by the Mayor and Chubb – demonstrates that the Mayor wanted to keep Chubb's agreement as quiet as possible. This evidence again could allow a jury to question the credibility of both Chubb and Mayor Weaver.

(Pl.'s Br. at 5-7).

Henderson correctly notes that the majority of the Sixth Circuit panel that decided the appeal in this matter expressly discussed this evidence as relevant circumstantial evidence of Chubb's bias or motive to lie about when he told Weaver of Henderson's report. *See Henderson*,

751 F. App'x at 627-28.

The Court **DENIES** the City's motion as to this issue and shall allow Chubb's settlement and release agreement, and testimony regarding same, to be admitted at trial. It is relevant evidence and its probative value is not substantially outweighed by a danger of unfair prejudice or confusion of the issues.

### 3. MLive Article Dated February 8, 2018

The City's motion asks the Court to preclude Henderson from introducing an Mlive news article, dated February 8, 2018, at trial. In response, Henderson states that she no longer intends to use that article. As such, this issue is **DENIED AS MOOT.**

### 4. Evidence And Testimony Regarding Henderson's Dismissed Claims

In the next section of its brief, the City asks the Court to "preclude Henderson from presenting evidence relating to any of her dismissed claims." (Def.'s Br. at 11). This section of the City's brief appears to make three arguments: a) Henderson conceded that the City did not breach her employment agreement; thus testimony or documents related to Henderson's alleged future economic damages is irrelevant and prejudicial; b) Henderson's proposed Exhibit N relates to the dismissed breach of contract claim; and c) Henderson's proposed exhibits concerning her hiring security relates solely to her dismissed defamation claim against Weaver or claims that were never filed, and therefore, should be excluded.

In response, Henderson "agrees that argument and evidence regarding her dismissed claims should not be admitted at trial." (Pl.'s Br. at 8). Henderson then addresses the City's challenges to her proposed Exhibits N (the February 23, 2016 Letter from City Council to the Governor) and Y (an email and invoicing relating to security hired by Henderson). Henderson

asserts that those exhibits are not presented as evidence or argument as to her dismissed claims,

"but rather to provide evidence disputing Mayor Weaver's alleged justifications for terminating

Plaintiff's employment and for establishing [her] damages." (*Id*. at 9).

### a. Testimony Or Documents Related To Henderson's Alleged Future Economic Damages

As its first argument in this section, the City asserts that "Henderson conceded that

Defendant did not breach her employment agreement; thus testimony or documents related to

Henderson's alleged future economic damages is irrelevant and prejudicial." (Def.'s Br. at 12).

The City's supporting argument then states:

> It is undisputed that Henderson's executed Employment Agreement (Ex.
> 1) governed the terms of her employment and the termination of same. Under the
> express terms of the Agreement, Henderson's employment was to end by
> February 22, 2020, but it could be terminated earlier under Paragraph 6.1 of the
> Agreement, either with or without cause. (*Id*.; Ex. 10, Henderson Dep. 50-52,
> 64). Based on Paragraph 6.1 of the Agreement, if her employment ended earlier
> than February 22, 2020, then Henderson's maximum recovery was limited to a
> sum equivalent to six months' salary as severance and a payout of her accrued but
> unused PTO. (Ex. 1, Agreement; Ex. 10, Henderson Dep. 52-53, 62-64). It is
> undisputed that Henderson received both of these things. (Ex. 2, Payout; Ex. 10,
> Henderson Dep. 52-53).
>
> Tellingly, Henderson voluntarily dismissed her breach of contract claims
> and, thus, she has already conceded that there was no breach of contract. (Dkt.
> #27, Dismissal.) Therefore, any testimony or documentation relating to purported
> "lost wages" should be precluded as it is irrelevant and would unnecessarily waste
> the time and resources of this Court.

(Def.'s Br. at 12-13).

The City appears to be arguing that, because Henderson abandoned her breach of contract

claim, she cannot receive a damages award in connection with her claim that she was wrongfully

discharged in violation of the WPA that consists of lost wages because she already received the

maximum severance award she could receive under the contract. (*Id*. at 12-13). The City has

not set forth any legal authority to support that position.

The Court does not see that Henderson responded to this argument. But Henderson clearly does not agree that she is precluded from seeking an award of lost wages in this WPA case because her trial brief expressly seeks such relief (back pay and front pay). (Pl.'s Trial Br. at 6).

Based on what has been presented, the Court **DENIES** this request. If Henderson was wrongfully terminated in violation of Michigan's WPA, it does not appear that her damages would be limited by the contractual terms of her employment agreement.

### b.    City Council's 2/23/16 Statement To Governor Snyder

One of Henderson's proposed exhibits is a February 23, 2016 statement from the City Council to the Governor that stated, in pertinent part:

> Additionally, by issuance of Receivership Transition Advisory Board for the City of Flint [RTAB] Resolution 2016-1, the Governor's actions have created a fiscal burden on the City of Flint by apparently leading Mayor Karen Weaver to believe she did not have to adhere to a Civil Employment Contract, prepared by the Governor's appointed Emergency Financial Manager (Darnell Early) on behalf of City Administrator Natasha Henderson. Please see enclosed contract and the termination clause which requires the approval of the Mayor AND the City Council AND the RTAB for contract termination. Mayor Weaver acted on her own initiative without consulting or notifying City Council and (perhaps) the RTAB. This has created a situation where the City of Flint is now obligated to pay Ms. Henderson in excess of Seven Hundred Thousand Dollars ($700,000.00). Instead of stabilizing Flint's fiscal situation, the State has added to the financial burden and fiscal instability.

(Def.'s Ex. 8). In that statement, the City Council further stated that the City Council had voted "NOT to terminate Natasha Henderson's contract." (*Id*.).

As to that proposed exhibit, the City's motion asserts that "correspondence expresses the City of Flint Council's then (misguided) view that Mayor Weaver violated the employment

agreement between Henderson and the City of Flint by relieving Henderson of her duties on February 12, 2016." (Def.'s Br. at 14). Defendant asserts that "[g]iven that Henderson voluntarily dismissed her breach of contract claim, and because Henderson's Ex. N cannot assist Henderson in establishing any element of her prima facie case alleging violation of Michigan's Whistleblower's Protections Act, it should be excluded." (*Id.*).

In response, Henderson does not contend that the above goes to her prima facie case, she asserts it is evidence that goes to pretext. Henderson asserts:

> The fact that the Mayor did not follow the appropriate [process] and procedure for terminating Plaintiff makes it more likely to be true that the Mayor had no intention of firing Plaintiff until she learned what she had reported to Chubb and that she was in a rush to terminate Plaintiff before she could do any further damage to the Mayor by repeating her concerns of financial misconduct. If the Mayor had legitimate concerns about Plaintiff's work performance or fitness for her "team," the Mayor would have brought the issue before the Council and RTAB and followed appropriate procedures. Exhibit N demonstrates that Mayor [Weaver] instead acted with haste and without pre-planning to quickly fire Plaintiff, thereby undermining the Mayor's claimed reasons for terminating Plaintiff.

(Pl.'s Br. at 9). Henderson states that to the extent that exhibit "contains language regarding a contract breach that can be redacted while retaining the evidence related to the Mayor's failure to follow the required procedure, Plaintiff would be willing to agree to the appropriate redaction." (*Id.* at 10).

Based on what has been presented, the Court **DENIES this request without prejudice to revisiting the issue at trial.** Depending on how the proofs play out, this exhibit is likely relevant evidence that goes to pretext.

### c. Letter And Invoice Regarding Henderson Hiring Armed Security

Henderson's proposed Exhibit Y consists of an email from Henderson to her lawyer, to which she attached an invoice for a security guard that Henderson apparently hired to protect her while she was in the City of Flint on March 10th and 11th of 2016, to retrieve her personal effects out of her apartment. (Def.'s Ex. 9). Henderson apparently paid $590.00 for that and plans to seek that cost as part of her damages at trial.

The City's motion asserts that evidence should be precluded because it relates solely to Henderson's dismissed defamation claim and/or "claims that were never filed" in this action.

The City asserts that this evidence must go to Henderson's dismissed defamation claim against Weaver. It also asserts that, to the extent that Henderson feared that someone would harm her, that was never part of her complaint in this action.

In response, Henderson contends that this evidence "is relevant to Plaintiff's emotional distress and resulting damages. The fact that Plaintiff felt enough anxiety and distress to hire security is directly probative of her distress. Plaintiff has a right to present evidence supporting her damages. If Defendant wants to present evidence and argue to the jury that Plaintiff's distress was unfounded or that her damages as demonstrated by Exhibit Y were unnecessary, it has every right to do so." (Pl.'s Br. at 10).

The Court agrees with Henderson and **DENIES** this request.

### 5. Trial Testimony From Aundrea Wilson

The City of Flint asks the Court to preclude Henderson from having Aundrea Wilson testify at trial. In response, Henderson states that she no longer intends to call Wilson as a witness at trial. As such, this issue is **DENIED AS MOOT**.

### 6. Testimony From Carly Raimondo And Benjamin Epstein

Finally, the City contends that "two of Henderson's at least four non-expert witnesses on emotional-distress damages (Carly Raimondo and Benjamin Epstein) will merely regurgitate duplicative testimony regarding what Henderson told them" and should therefore be precluded under Fed. R. Evid. 403. (Def.'s Br. at 18). The City's argument as to this testimony appears to be two-fold: 1) that offering this testimony is "a thinly-veiled attempt to introduce experts by circumventing the disclosure rules"; and 2) the testimony would be cumulative.

To the extent that the City objects to the testimony as cumulative, that is an issue better decided during the course of the trial, as the proofs are presented.

To the extent that the City argues that these lay witnesses should be precluded from testifying because "the jury may perceive Raimondo and Esptein as experts," the Court rejects that argument. (Def.'s Br. at 21). As Henderson's response explains:

> As this Court and Defendant is aware, it is quite common for treating providers to testify on behalf of plaintiffs. As with any lay witness with relevant information, Raimondo and Epstein will testify regarding their direct observations and mental health treatment of Plaintiff, relevant to her claims for damages. They will not testify as to any expert opinion or to any facts outside of their personal observation and treatment of Plaintiff. Defendant's attempts to disqualify them as supposed experts is, therefore, misplaced.
>
> . . . .
>
> Likewise, merely suggesting that because the witnesses may be perceived as experts their testimony is unfairly prejudicial is nonsensical. If that were the standard, no treating medical or mental health provider would ever been able to present evidence to a jury for fear the implied expertise of their position would cause unfair prejudice.

(Pl.'s Br. at 11).

## B.     Henderson's Motion In Limine Regarding Jody Lundquist's Opinion Testimony

During discovery, Jody Lundquist testified that she was the Chief Financial Officer for

12

the City of Flint from June of 2015 through approximately May of 2016. (Lundquist Dep. at 9).

When Lundquist began in June of 2015, she reported to Henderson. (*Id.* at 12). At that time,

Mayor Dayne Walling was in office. (*Id.* at 29). Lundquist testified that she had active and

frequent interaction with the City's chief counsel (Chubb) and the City's administrator

(Henderson). (*Id.* at 43). Lundquist testified that Henderson told her about her report to Chubb

regarding Mayor Weaver. (*Id.* at 65-67). She also testified that she did not tell Mayor Weaver

about Henderson's report to Chubb. (*Id.* at 98-99).

During her deposition in this case, Lundquist testified that she does not believe that

Henderson was terminated because of her report to Chubb:

> Q.      Do you believe Ms. Henderson – based on your knowledge, do you
>         believe Ms. Henderson was *terminated because* she raised this concern
>         regarding the mayor?
> A.      No.
> Q.      What do you believe regarding her termination?
> A.      That the mayor had been authorized or that her power to appoint staff had
>         been restored by the amendment of emergency manager orders and that
>         she had been clear about her intentions to appoint her own team.
> Q.      When you say she had been clear, the mayor?
> A.      The mayor had been clear.
> Q.      So were you ever concerned that your employment would be terminated
>         by Mayor Weaver?
> A.      Yes.
> Q.      Did you consider Ms. Henderson a friend while you were employed by the
>         city?
> A.      Yes.
> Q.      Do you still consider her a friend?
> A.      Yes.
> Q.      Do you still communicate with her?
> A.      Yes.

(*Id.* at 101-02) (emphasis added). Lundquist also testified:

> Q.      Okay. Do you remember talking to Councilman Scott Kincaid soon after
>         Natasha Henderson's termination about these allegations?
> A.      I don't recall.

Q.   Okay. Do you remember having a meeting on or about February 15th with Scott Kincaid and you bringing this matter up about the – about the allegations?

A.   I don't recall.

Q.   Okay.  Do you remember ever saying to him that you believed that that was one of the reasons she was terminated?

A.   I don't recall.

. . . .

Q.   Okay.  And again, Scott Kincaid testified that in a meeting soon after Natasha Henderson's termination that you said that part of the reason she was fired was because of the allegations she brought to Chubb – Tony Chubb.  Do you agree with that testimony?

A.   I --
     MS. BUCKLEY-NORWOOD: Misleading.

A.   I can't recall that conversation.

(*Id.* at 67 & 101-02).

In her first motion, Henderson asks the Court to exclude "all trial argument and evidence relating to former City of Flint CFO Jody Lundquist's opinion testimony concerning why she thought the Mayor fired Plaintiff."  (Pl.'s Br. at 2).  Her motion asserts that Lundquist "was not involved in the decision to fire Plaintiff, was not present at the termination meeting, and had no firsthand knowledge regarding Mayor Weaver's motive or basis for her decision.  It is the jury's role as fact-finder to determine whether Mayor Weaver fired Plaintiff because she reported financial misconduct, not Ms. Lundquist's role to guess at her reason."  (Pl.'s Br. at 2-3).  She contends that the testimony is not relevant and would confuse the jury.

As to relevance, Henderson asserts that: "[h]ere, the consequential questions of fact for the jury are whether Mayor Weaver had knowledge that Plaintiff reported the alleged financial misconduct and whether Mayor Weaver fired Plaintiff because of the report. Ms. Lundquist's opinion absent any firsthand knowledge of Mayor Weaver's intent does not make either fact more or less likely to be true."  (Pl.'s Br. at 6).

As to confusion, misleading the jury, and prejudice, Henderson's motion in limine

asserts:

> Further, even if Ms. Lundquist's opinion regarding Mayor Weaver's motive was to some degree supported by her actual observations, the idea – if believed – that Mayor Weaver had "intentions to appoint her own team" does not preclude Defendant's liability for violating WPA when the Mayor fired Plaintiff. Mayor Weaver may have wanted her own team in place so that she would operate as she desired without challenges and without investigations into her decisions, like her redirection of the public's donations from the approved SWSH Fund into her own 527 discretionary fund. Mayor Weaver may have decided she would prefer "her own team" to avoid having people like Ms. Henderson watching her and reporting misconduct. *Further, Michigan law requires only that the plaintiff's engaging in "protected activity" was one reason for the termination for WPA liability to arise; it does not require that "protected activity" be the only reason, or even the main reason. Mich. Civ. Jury Instr. 107.03.* Ms. Lundquist's opinion, however, could lead to confusion and unnecessarily muddy the waters regarding the jury's findings of fact.

(*Id.* at 7-8) (emphasis added).

Henderson also asserts that Lundquist's opinion as to why Mayor Weaver fired her is not

admissible under Fed. R. Evid. 701 because it is not based on personal knowledge, as required

by the rule. (Pl.'s Reply Br.).

The City asserts that the opinion evidence from Lundquist is admissible under Fed. R.

Evid. 701. The City appears to want to elicit testimony from Lundquist that: 1) Mayor Weaver

was clear about her intentions to appoint her own team after her power to do so was restored; and

2) Lundquist does not believe the City of Flint discharged Henderson because of Henderson's

email to Chubb – the alleged protected activity at issue in this case. (Def.'s Br. at 2).

The City's response also asserts that, during discovery, Henderson's counsel "falsely

insinuated Lundquist said Henderson was discharged because of the communication to Chubb."

(Def.'s Br. at 2).

The only Sixth Circuit decision that the City cites is *Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985).

Henderson's argument that the Court should exclude Lundquist's opinion testimony because it goes to an ultimate issue to be decided by the jury can be deposed of easily. Testimony "in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a); *Miller v. Alldata Corp.*, 14 F. App'x 457, 465 (6th Cir. 2001). Thus, the Court must consider whether the opinion testimony is admissible under Rule 701.

The Sixth Circuit has held that "it is not error to allow a lay witness to express an opinion regarding discrimination in an employment setting as long as the opinion complies with the requirements of Rule 701." *Miller,* 14 F. App'x at 465; *Torres v. County of Oakland*, 758 F.2d 147, 149-50 (6th Cir. 1985). Rule 701 of the Federal Rules of Evidence governs "Opinion Testimony by Lay Witnesses" and provides as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witnesses perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. As to the requirement that the opinion be rationally based on the witnesses perception, commentators have explained that "merely requir[es] that 'the opinion or inference is one which a normal person would form on the basis of the observed facts.'" *Torres*, 758 F.2d at 149. In other words, there is a "foundational requirement of personal knowledge of the outward events" that form the opinion. *Id.* at 150.

In *Torres*, the plaintiff alleged national origin discrimination after she was not selected for a supervisory position by her employer. The trial court admitted opinion testimony from an individual who took part in selecting the person to fill the position at issue, who testified that she did not believe that the plaintiff had been discriminated against because of her race. "During the examination of" that witness by the defendants, that witness was permitted to testify as follows:

> Q.     Is it true, Dr. Quiroga, that you did not believe that Ms. Torres had been discriminated against because of her national origin in that interview process?
> MR. KAREGA: Objection, our Honor.
> THE COURT: No, she may state her opinion on that.
> A.     That is correct.

*Torres, supra,* at 149.

On appeal, the plaintiff challenged that ruling, arguing that opinion testimony was not proper under Fed. R. Evid. 701 because it was not sufficiently based on personal perception and because it was testimony containing a legal conclusion. *Id*. at 149.

The Sixth Circuit rejected the first argument, stating: "The record in this case clearly establishes that Dr. Quiroga was privy to the details of Dr. Malueg's selecting the new supervisor. The foundational requirement of personal knowledge of the outward events has thus been satisfied." *Id*. at 150.

The Sixth Circuit agreed with the plaintiff, however, that the "precise language of the question put to Dr. Quiroga," (ie., whether the plaintiff had been discriminated against because of her national origin), "called for an improper legal conclusion." *Id.*  The court noted that the "problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury," which invades the province of the court to determine the applicable law and instruct the jury as to that law. *Id*. at 15.  The Sixth Circuit

explained why it found the question posed to the witness a problem:

> The precise language of the question put to Dr. Quiroga was whether "Torres had been discriminated against because of her national origin." In concluding that this question called for an improper legal conclusion, we rely on several factors. First, the question tracks almost verbatim the language of the applicable statute. Title VII makes it unlawful for an employer to "discriminate against any individual . . . because of such individual's . . . national origin." *See* 42 U.S.C. § 2000e-2. Second, the term "discrimination" has a specialized meaning in the law and in lay use the term has a distinctly less precise meaning.
> . . . .
> We emphasize that a more carefully phrased question could have elicited similar information and avoided the problem of testimony containing a legal conclusion. The defendants could have asked Dr. Quiroga whether she believed Torres' national origin "motivated" the hiring decision. This type of question would directly address the factual issue of Dr. Malueg's intent without implicating any legal terminology.

*Id.* at 151. The Sixth Circuit held that the trial court should not have admitted this opinion testimony, but ultimately found the error harmless.

Here, the City contends that Lundquist's opinion testimony is admissible under Rule 701, but does not explain how it meets the foundational requirement of personal knowledge. The City directs the Court to Lundquist's deposition testimony that Mayor Weaver "was clear" about wanting to appoint her own team after her power to do so was restored, but does not explain how Lundquist formed such an opinion. Rather, the City vaguely asserts:

> In this matter, Lundquist's opinion is based on personal knowledge and her personal perceptions gleaned from frequent interactions with Henderson, her meetings and conversations with Mayor Weaver, and her familiarly with the atmosphere within the City of Flint as the full-time Chief Financial Officer, with knowledge of the allegations Henderson has made in her efforts to advance her case.

(Def.'s Br. at 6-7). The Court fails to see how Lundquist's interactions with Henderson could give her personal knowledge as to Weaver's motivation for firing Henderson. This Court does not know what the City means by Lundquist's "familiarity with the atmosphere within the City

of Flint."  That leaves her unspecified "meetings and conversations" with Mayor Weaver, but no detail regarding those conversations was provided.

Accordingly, based on what has been presented, the Court concludes that the City has not established that Lundquist's opinion testimony is admissible under Fed. R. Evid. 701.

## C.     Henderson's Motion In Limine To Exclude Gambling Evidence

In her second motion, Henderson asks the Court to exclude argument and evidence "relating to Ms. Henderson's lawful gambling hobby."  (Pl.'s Br. at 2).  Henderson claims that evidence of her legal gambling is not relevant and any minimal probative value is substantially outweighed by unfair prejudice, risk of jury confusion, and waste of time.

Henderson claims that evidence of her gambling has no relevance to damages.  She asserts that she "engaged in this hobby before, during, and after her employment with Defendant, and there is no arguable basis for claiming it was ever a concern or impacted her hours or income."  (*Id*. at 5).

Directing the Court to *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 520 (6th Cir. 2009) and *Lilly vv. City of Beckley*, 797 F.2d 191, 196 (4th Cir. 1986), Henderson asserts that even if she had made money from gambling following her termination, it would still not be relevant because money earned from supplemental employment does not constitute "interim earnings" for which the defendant can seek a set-off, if the plaintiff could perform their job and engage in the secondary work at the same time.

That line of authority, however, really does not apply here because Henderson claims that she has not actually earned any money from gambling because, as her recent tax returns will show, she has lost the same amount or more than her winnings.  Thus, this does not appear to be

a case in which the City will be trying to offset her claimed economic damages for lost wages by Henderson's gambling income – because the net effect of her gambling was either a wash or a loss each year.

Henderson's main argument is that to allow evidence of her gambling would be unfairly prejudicial and should therefore be excluded under Fed. R. Evid. 403. Her argument is two-fold. First, she asserts that the evidence will be unfairly prejudicial because "some jurors may have strongly held beliefs about the propriety and morality of this activity," and could cause jurors to make a decision based on "their prejudicial view that she engaged in improper or immoral activities." (*Id*. at 7). Second, she asserts that admitting gambling evidence will confuse the jury and waste trial time, because Plaintiff will have to present testimony as to how tax law works as to gambling gains and losses, in order to show that she did not profit from her gambling. (*Id*. at 8). The basic concept, however, does not appear complex – "under state and federal tax law, an individual may not deduct gambling losses in excess of his/her gains. Therefore, if an individual loses more than he or she makes in gambling proceeds in a given year, reported losses will exactly equal gains on a tax return." (Pl.'s Br. at 8). That Plaintiff would have to offer testimony to explain this, and show that she did have a net profit, does not appear complex or burdensome.

Perhaps most importantly, none of the cases that Henderson relies on involve an analogous situation to this case, *where the plaintiff is seeking emotional distress damages*, claiming that her alleged improper termination caused her emotional distress, and the defendant is seeking to offer the gambling evidence in order to show that some of the emotional distress may be due to issues concerning gambling or gambling losses. While the City has mentioned

several bases for the relevance of the gambling evidence, this is its strongest argument.

The City directs the Court to *Mehus v. Emporia State Univ*., 326 F.Supp.2d 1213 (D. Kan. 2004) and *Siring v. Oregon Bd. of Higher Educ*., 2013 WL 5536310 (D. Oreg. 2013) for the proposition that Plaintiff's gambling losses are relevant to her claim for emotional distress damages.

In *Mehus*, the plaintiff brought Title VII and Equal Pay Act claims against her employer and her damages sought included emotional distress damages. The plaintiff brought a motion in limine, asking the trial court to prohibit evidence and argument as to her gambling winnings and losses, arguing such evidence is irrelevant and any probative value would be substantially outweighed by the danger of unfair prejudice. The trial court rejected that argument, explaining that Defendant "argues that plaintiff's gambling losses – which are obviously are large in relation to her salary – are relevant to her claim for damages for emotional distress. The Court agrees. Through her damage claim, plaintiff has made such evidence relevant. Any concern that jurors could take a 'dim view' of gambling may be addressed in the jury selection process." *Id.*

Likewise, the trial court in *Siring* rejected the plaintiff's motion to exclude evidence regarding the plaintiff's gambling in an employment case wherein the plaintiff sought emotional distress damages. The trial court agreed that a "financial stressor can be relevant to emotional distress" and ruled that if an evidentiary foundation is laid "that shows that Plaintiff's gambling activities may be contributing to her emotional distress since 2009," the relevant time period at issue in that case, the evidence would be allowed. *Siring, supra*, at *2.

Other courts have also expressed that when a plaintiff in an employment suit asserts a claim for emotional distress damages, evidence concerning that individual's gambling losses is

relevant.  *See, eg., Tilgham v. Kirby,* 2014 WL 7238656 (W.D. Ok. 2014) (Noting that it is "well-established in the context of claims arising from unlawful employment practices that a plaintiff seeking to recover damages for emotional distress opens the door to evidence of other probable causes of her distress" and finding evidence of gambling losses relevant.); *Raymond v. Ameritech Corp*., 2004 WL 1381134 (N.D. Ill. 2004).

Here, it appears undisputed that in 2016 and 2017, Henderson's gambling earnings totaled *more than a million and a half dollars*.  Henderson contends that she had no net gain during those years, because her actual gambling losses during 2016 and 2017 equaled or exceeded that amount.  As such, we have a situation where the plaintiff asserts that she had annual gambling winnings and losses that significantly exceeded her former salary with the City.  As such, those gambling losses could be a potential cause of some of the emotional distress that Henderson may have experienced during that time period.  The evidence is relevant to Henderson's claimed emotional distress damages.  And it is more than "marginally relevant," considering the very large amount of her gambling winnings and losses.

The Court must also consider, however, whether such evidence should nevertheless be precluded under Fed. R. Evid. 403.

As Henderson herself has noted in her briefs, "[a]ll relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded.  (ECF No 78 at PageID.1759) (citations omitted).  While Henderson may not like that the evidence concerning her gambling losses is probative regarding the possible causes of her claimed emotional distress damages, the Court does not believe she has established any unfair prejudice that would outweigh the

relevance of this probative evidence.[1]  Moreover, as the City notes, any potential prejudices that a prospective juror may have about gambling can be addressed during voire dire.  Based on what had been presented, the Court **DENIES** this request to exclude all argument and evidence regarding Henderson's gambling winnings/losses.

## CONCLUSION & ORDER

At the April 29, 2019 hearing, Counsel for the parties expressed that they may be able to agree upon a stipulation that would resolve the first issue presented in the City of Flint's Motion In Limine.  If the parties are unable to so, they should advise the Court and the Court will make a ruling on that issue.  As explained above, with respect to the remaining issues in the motion, the Court **ORDERS** that the City's Motion in Limine is **DENIED.**

**IT IS FURTHER ORDERED** that Henderson's Motion In Limine Regarding Gambling Evidence is **DENIED**.

**IT IS FURTHER ORDERED** that Henderson's Motion in Limine Regarding Opinion Testimony from Jody Lundquist is **GRANTED.**

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  April 30, 2019

---

[1]Henderson's Counsel asserts that this Court must engage in the 403-balancing test discussed in *United States v. Jackson-Randolph*, 282 F.3d 369, 379 (6th Cir. 2002) before it can admit evidence of gambling at the trial in this case.  That case, however, was a criminal case that involved the admission of evidence of an affluent lifestyle to show motive for committing a crime.  As such, the specific balancing test discussed in that case simply does not apply here.